Bartlett *v.* Wood et al.

---

S. J. BARTLETT *v.* FORIS WOOD AND *Trustees*, HOLT, SPEAR
AND LONTO.

*Exceptions.   Trustee Process.   Fixtures.   Tools.   Attachment.*

When a case passes to the supreme court upon exceptions, error must be shown
by the exceptions, or the judgment below will stand.

In the trustee process, if the indebtedness of the trustee to the principal debtor
is payable in labor or specific property on demand, and there had been pre-
vious to the service of the trustee process, no breach of the contract, the judg-
ment against the trustee must be that he is chargeable for the amount of his
indebtedness, payable to the plaintiff in the specific manner prescribed by the
original contract.

Machinery in a blacksmith's and wagon maker's shop, which, though fastened
to the building, was only so attached for the purpose of making it firm for
use in its place, and which could be removed without seriously injuring the
building, said machinery consisting of a boring lathe, an engine lathe, a
wood turning lathe, a press drill, a press punch, an upright saw, and a cir-
cular saw, all being propelled by water, *held* to be personal property and not
fixtures, and as such liable to attachment by the trustee process.

The doctrine of the cases of *Hill* v. *Wentworth*, 28 Vt. 428, and *Fullam et al.* v.
*Stearns et al.*, 30 Vt. 443, in regard to fixtures, reaffirmed.

If personal property owned in common be in the possession of a third party,
the interest of one of the owners therein may be attached by the trustee pro-
cess against the party in possession.

TRUSTEE PROCESS.    The case was referred to a commissioner
who reported the following facts :

The principal debtor, Wood, had for some time previous to
October 5th, 1858, been engaged in the business of blacksmithing
and carriage making at Derby, and the trustees had each been
individually employed by him as workmen, and he was indebted
to each of them in different amounts.    On that day, Wood
being in embarrassed circumstances, sold his stock to the trustees
at cost, including freight, and at the same time rented them the
shop which he had occupied, together with the machinery and
tools therein, for one year at the annual rent of seventy-five dol-
lars.    The trustees at the same time agreed with Wood and one
Chandler, to whom Wood was indebted in the sum of seventeen
dollars and forty-seven cents, that they would pay that sum to
Chandler, who thereupon discharged Wood from such indebt-

'edness. It was agreed between the trustees and Wood that the aggregate of the latter's indebtedness to each of them, and the Chandler debt assumed by them, should be applied in payment for the stock purchased by them, and of one year's rent of the shop, machinery and tools. The trustees further agreed with Wood that if after making this application they should still be indebted upon such purchase to the defendant, they would pay in their work fifty dollars to one Page, to whom the defendant was then indebted in that amount. Page, however, was not aware of this agreement at the time and was not apprized of it until after the service of this trustee process, but after that time the trustees did work for him with an understanding that fifty dollars worth of their work should be applied in payment of Wood's debt to him unless this trustee process interfered with such a disposition of the matter. The trustees at the time of such purchase, further agreed that if, after paying the Page claim, they should still remain indebted to the defendant, they would pay him such balance in their work on reasonable notice, the articles manufactured to be delivered at their shop, and at cash prices. At the time of this purchase no invoice had been made of the stock, and the parties were not certain whether its value would be sufficient to meet the indebtedness from Wood to the trustees or not. The contract was entirely verbal except the lease.

The trustees and Wood then proceeded to invoice the stock, and it was found to amount to four hundred and sixty-nine dollars and twenty-nine cents. The trustees immediately took possession of the shop, machinery, tools and stock, formed a copartnership among themselves, and commenced the same business in which Wood had been formerly engaged, and at the date of the commissioner's report were still engaged therein.

After the formation of the copartnership and subsequent to the service of this trustee process upon them, the trustees settled with the defendant and found that the aggregate amount due from him to them, together with the Chandler debt, was two hundred and fifty-eight dollars and twenty-five cents. The shop leased by Wood to the trustees was built by the former for a carriage and blacksmith shop, and had always been used for that purpose. At the time it was built, certain machinery, being such as was

required in that business, was put into the shop, and so arranged as to be propelled by water with the ordinary gearing for such machinery.

The following is a description of the articles of machinery so put in, and the mode in which they were situated in the building :

In the woodshop was an upright saw, and the timbers connected with it were framed into the floor of the shop, and boards were nailed to the timbers of the shop overhead, and the timbers connected with the saw were framed into these boards. There was also a circular saw in the woodshop, fixed in a frame, which frame was nailed with large irons to the floor, and also mortised into it ; also a boring lathe, fixed or fastened into a frame, bolted to the floor with two iron bolts, and braced on both sides by braces nailed to the frame and floor ; an engine lathe, framed into large heavy timbers, and securely nailed to the side of the shop. This engine lathe was owned in common by the defendant and one Fairchild. It was originally purchased by Wood and Fairchild, and had ever since been used in carrying on the carriage business. There was a wood turning lathe which sat on this engine lathe frame and ran by the same pulleys. There was a trip hammer in the blacksmith's room, built as follows : There was a head or anvil block consisting of a large timber, one end of which rested on the ground. This timber passed through the floor of the blacksmith's shop, the upper end of it standing over two feet above the floor. The anvil on which the hammer struck was bedded into the end of this anvil block. Two heavy timbers were framed at one end into this head or anvil block, and the other ends were supported by upright timbers framed into them. These upright timbers passed through the floor to the ground, where there was a large timber for a bed piece, into which they were framed. The handle to the hammer was a stick of timber, and the end most distant from the hammer was fixed into the timbers which were framed into the head block.

There was also in the blacksmith's shop a press drill. The table supporting the article to be drilled was mortised into the side of the building. The rest of the machinery was bolted to a plank, securely spiked to the building. The table of the press drill was a piece of common plank about ten inches in width by fifteen

inches in length. This plank tapered off at greater length, forming a sort of handle which was mortised into the side of the building, and this table was supported by a brace underneath it, and was in no manner connected with the rest of the machinery, its whole use and object being to support the article to be drilled.

A press punch sat in a bench in the blacksmith's shop, and was intended to be fastened to the bench, which, however, had not yet been done. The foot piece of this press punch was situated under the bench, and was fastened to the side of the building. This press punch was not intended to be, and was not carried by water.

There was also a tire roller in a frame much like a grindstone frame, not stationary, moved by hand. There were also in the blacksmith's shop three good anvils and one poor one, and they were all required in the business. The other tools were such as would be required by one blacksmith in carrying on his trade, and no more. All the machinery and tools above named were used in carrying on the business for which the shop was erected. A tire roller is required and is generally kept by blacksmiths.

Previous to the passage of the law of 1856, relative to mortgaging machinery, Wood sold the shop to C. L. Kelley, Moses Wood and C. R. Clough, and took a mortgage back for a part of the purchase money, and transferred this mortgage security to Wm. M. Dickerman. In this deed to Kelley, Wood and Clough, and in the mortgage, the machinery then in the shop was mentioned as being included therein, and soon afterwards Clough conveyed his interest in the premises and machinery to Moses Wood and C. L Kelley, and finally the defendant, Foris Wood, repurchased the premises and machinery, and agreed to pay the mortgage debt to Dickerman, which, at the time of the hearing, amounted to about eight hundred dollars. Subsequent to the service of the trustee process the defendant quitclaimed the shop, machinery and tools to the trustees, who agreed to pay the Dickerman incumbrance thereon.

The commissioner further reported that the defendant was a blacksmith and carriage maker by trade, but that since the making of the lease above described to the trustees, he had not been

engaged in the business of his trade. At the time of the service of the trustee process the tools and machinery, except one-half of the engine lathe, belonged to the defendant, and were held by the trustees under their lease from him.

The commissioner also found that the trustees did not take the lease nor purchase the stock with any design to defraud any one, but merely to secure their own claims and provide themselves with business, and that they agreed to pay the full value of the rent and stock.

The trustees claimed a right to the shop, machinery and tools until October 5th, 1859, under their lease. The machinery, except the trip hammer, could all be taken out of the shop without seriously injuring the main part of the building. The trustees also claimed that the machinery was a part of the real estate, and that the tire roller and other tools were tools of the defendant's trade, and exempt from attachment, and that therefore the trustees could not be made chargeable either for the machinery or the tools.

The plaintiff claimed that the trustees were chargeable for the machinery and tools, and that they should be ordered to deliver them to him at the expiration of the lease.

The commissioner further reported that the amount of stock purchased by the trustees was four hundred and sixty-nine dollars and twenty-nine cents; that the rent of the premises from the date of the lease (being October 5, 1858,) to the third day of June, 1859, (being the date of the disclosure and hearing before the commissioner,) amounted to the sum of forty-nine dollars and fifty-nine cents, making in the whole the sum of five hundred and eighteen dollars and eighty-eight cents; that deducting from this sum the indebtedness of the defendant to the trustees at the time of the sale of the stock, and also the Chandler debt, amounting in the whole to two hundred and fifty-eight dollars and twenty-five cents, would leave the sum of two hundred and sixty dollars and sixty-three cents, for which amount the commissioner held the trustees chargeable, to be paid in work at their shop in Derby on reasonable notice, or in such property as they manufactured, or both, according to the election of the plaintiff.

If the court should be of the opinion that the trustees were also entitled to deduct from this indebtedness to the defendant the

fifty dollars which they had conditionally promised him they would pay to Page, as above stated. then the commissioner found them chargeable for fifty dollars less than the amount above reported.

Upon these facts the county court for Orleans county, at the June Term, 1859,—POLAND, J., presiding,—adjudged the trustees chargeable for the sum of two hundred and sixty dollars and sixty-three cents, to be paid in work, as detailed in the report, deducting therefrom the trustees' costs. The court also adjudged the trustees chargeable for three anvils, including the poor one described in the report, to be delivered by the trustees to the officer holding the plaintiff's execution against the defendant on demand after the expiration of the lease from the defendant to the trustees.

To this judgment of the court the plaintiff excepted.

*Edwards & Stewart,* for the trustees.

*A. D. Bates,* for the plaintiff.

BARRETT, J. The questions in this case arise on exceptions taken by the plaintiff to the judgment against the trustees. There are two subjects of complaint; one that the judgment should have been for the whole year's rent, as well as for more of the specific chattels held under lease by the trustees; the other, that the judgment should have been in different form as to the mode of paying the amount found due for rent, and for the property that was purchased by the trustees of the defendant, Wood.

I. The same rule is applicable to this as to any other case that comes before this court on exceptions. Error must be shown by the exceptions or the judgment must stand. We make this remark with particular reference to the point made in argument as to the rent. We well understand and fully recognize the law by which a lessee may be holden for rent for the full term of his lease, even though the buildings should be destroyed by fire, flood, or tempest before the expiration of the term. But whether he is so holden or not would depend on the specific provisions of the

lease. In this case the lease is not before us, nor are its terms stated, except as to the time it was to run, and the rate of the rent to be paid. The lease, as it was shown to the commissioner, did not appear to him to bind the lessees to pay the rent absolutely for the full term. The county court have acted on his finding, and rendered a judgment touching this subject. There is nothing before us to show error in that judgment in this respect, and so of course we do not find any.

II. We see no error in regard to the mode prescribed for paying the two hundred and sixty dollars and sixty-three cents. It is directed to be paid in work, as particularly stated in the report; which we understand to mean that it is to be paid in work, according to the terms of the contract between Wood and the trustees. This is the only judgment warranted by the statute. The trustees cannot be held to pay in any other mode, nor upon any other terms than those provided in the contract under which they purchased and held the property. If there is difficulty or embarrassment in realizing the fruits of the judgment by the plaintiff, it is his misfortune, arising from the nature of the subject and the state of the statute law.

III. Under the decisions in this State, commencing early and now embracing two very fully considered cases of recent date; we are compelled to regard the boring lathe, the engine lathe; the wood turning lathe, the press drill, and the press punch, as being unquestionably personal chattels and subject to attachment and levy of execution as such. We should have as little trouble in so treating the upright saw and the circular saw, were it not for what is said about the mode of their attachment to the building. We understand from the report, that the upright side timbers of the upright saw are framed into *the floor* by a tenon received into a mortise in the floor, and that this is done for the purpose of holding it steady, to the same intent as might have been accomplished by 'bolts or cleats at the foot of these side timbers. We understand this to have been done, not by way and for the purposes of incorporating the said machine into the building as a part of it, in a similar manner and to the same intent as is done in the case of an ordinary saw mill for sawing logs. The mode in which the frame is fastened overhead shows that the purpose was merely

to make a *moveable machine* firm for use in that place, which might, on being removed, be as well placed in any other suitable shop, and be fastened and used in a similar way. The mode in which the *circular* saw is fastened is less like incorporating it with the shop, than is that of the upright saw. The commissioner expressly finds that said machinery could be taken out of the shop without seriously injuring the main part of the building. Independently of the particular manner in which these machines are fastened for use in said shop, it is beyond question that they are mere chattels. That manner of fastening is the only thing shown in the case that could operate to change their character. We think, to treat them in view of that manner of fastening, as being a part of the realty, would do violence to the case of *Hill* v. *Wentworth*, 28 Vt. 428, and *Fullam et al.* v. *Stearns et al.*, 30 Vt. 443. We do not propose any further discussion in this case of the law of fixtures. The law as developed, expounded and applied in those cases, would become no clearer, either as to its principles, or its due application, by what might now be said.

The articles, now named, being personal chattels and being in the hands of the trustees at the time process was served, said trustees became chargeable for them by force of the statute, and the expositions thereof by this court in cases that have passed into judgment. As to the engine lathe, of which it appears that the defendant is the owner of an undivided half, nothing in particular need be said. The defendant's interest in it is subject to the attachment of his creditors. Unless the other joint owner has asserted his right and taken it from the possession of the trustees, it is chargeable with execution in their hands in virtue of the defendant's interest, the same as any other of the articles. The officer who may have the execution will act under it agreeably to his judgment of his official duty. The trustees will be acquitted by having the article ready for his custody on lawful demand. In case the article has been taken from them by the other joint owner, it will be reasonable to settle any question that may arise in respect thereto, when it shall be legitimately before the court.

The claim as to the trip hammer is abandoned by the plaintiff. Upon the facts reported we regard the *tire roller* as being a tool

of the trade of a blacksmith, and therefore exempt from attach-
ment and trustee process.

The judgment of the county court being correct as far as it
went, is now reversed *pro forma,* and judgment is here rendered
that the trustees are liable according to the terms of the judgment
of the county court, and in addition thereto for the said articles
named in said report and above named, to wit, the upright saw,
the circular saw, the boring lathe, the engine lathe, the wood
turning lathe, the press drill, and the press punch, to be delivered
to the officer holding the execution that shall be issued in this
case, upon lawful demand made in that behalf, the trustees' costs
in this court and also in the county court to be deducted from the
*indebtedness* for which said trustees are adjudged chargeable.